**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Casey Carroll,<br><br>Plaintiff,<br><br>v.<br><br>Nutrien Ltd; Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Inc., f/k/a Koch Industries, LLC; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; Koch Agronomic Services, LLC; Yara International ASA; Yara North America, Inc.; and The Mosaic Co.,<br><br>Defendants. | Civil No. 1:26-cv-3745<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## TABLE OF CONTENTS

**INTRODUCTION ..... 1**

**JURISDICTION AND VENUE ..... 3**

**PARTIES ..... 5**

A. PLAINTIFF ..... 5

B. DEFENDANTS ..... 6

1. Nutrien Defendants ..... 6
2. CF Industries ..... 6
3. Koch Defendants ..... 6
4. Yara Defendants ..... 9
5. Mosaic Defendants ..... 9

C. AGENTS AND CO-CONSPIRATORS ..... 10

**II. FACTUAL ALLEGATIONS ..... 12**

A. Making and Selling NPK Fertilizers in the NPK Fertilizers Market ..... 12

B. Defendants Sharply Raised NPK Fertilizer Prices. ..... 19

C. The Department of Justice Investigation into Fertilizer Price-Fixing. ..... 24

D. Plus-Factors Show the Prime Fertilizer Market Is Susceptible to Cartelization ..... 26

1. Concentrated Market ..... 26
2. Barriers to Market Entry ..... 28
3. Commodity Product ..... 28
4. Inelastic Demand ..... 29
5. Fragmented Farmer Market ..... 30
6. Opportunities to Collude ..... 31
7. History of Collusion ..... 35

**III. CONTINUING VIOLATION ..... 36**

**IV. CONCEALMENT OF ANTITRUST VIOLATION. ..... 37**

**V. INTERSTATE TRADE AND COMMERCE ..... 39**

**VI. ANTITRUST INJURY ..... 40**

**VII. CLASS ACTION ALLEGATIONS ..... 41**

**VIII. CLAIMS FOR RELIEF ..... 45**

## INTRODUCTION

1. On March 4, 2026, the press reported that the United States Department of Justice was investigating collusion in the pricing and sale of the primary fertilizers (nitrogen, phosphate, and potassium, together the "**NPK Fertilizers**"). A news report stated, "[t]he probe targets CF Industries Holdings Inc (NYSE:CF), Nutrien Ltd (NYSE:NTR), The Mosaic Company (NYSE:MOS), Koch Inc., and Norway's Yara International, which collectively control most nitrogen-based fertilizer sold in the U.S. and dominate potash and phosphate markets."[1]

2. Those five corporate families, which dominate the NKP Fertilizer market in which they manufacture and sell the principal or primary fertilizers, imposed dramatic price spikes on their customers in 2021 and 2022, matched by the producer's substantial revenue and net income spikes. In 2021, United States farmers' fertilizer prices increased over 65%. Nitrogen fertilizer prices jumped 95% and potash prices rose over 70%. These prices "added an estimated $128,000 in costs per farm for feed grain operations in 2022."[2]

3. The price spike from 2021 to 2022 shows a significant break in the price patterns from at least 2015 to 2020, a break in pricing patterns consistent with price hikes imposed by an industry cartel.[3]

---

[1] Frank DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion*, Yahoo!finance (March 4, 2026), https://finance.yahoo.com/news/justice-department-probes-fertilizer-giants-192006014.html (accessed March 8, 2026); Rob Williams, *Justice Department Investigates Fertilizer Producers Over Possible Price Collusion*, Seeking Alpha (March 4, 2026), https://seekingalpha.com/news/4560887-justice-department-investigates-fertilizer-producers-over-possible-price-collusion (accessed March 8, 2026).

[2] DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion, supra.* (All currencies in this Complaint are United States dollars unless otherwise indicated).

[3] *Producer Price Index by Industry: Fertilizer Manufacturing*, Federal Reserve of St. Louis, (updated Feb. 27, 2026), https://fred.stlouisfed.org/series/PCU3253132531 (accessed March 8, 2026).




4. The NKP Fertilizer Market is structurally ripe for collusion. The "plus factors" that facilitated a price-fixing conspiracy include a concentrated market, entry barriers including multi-million or billion-dollar factories to produce fertilizer at scale, homogenous commodity products, critical farm products creating inelastic demand, a fragmented farmers' buyers' market, opportunities to collude through joint ventures and shared trade association boards, and a history of collusion that courts have previously found plausible.

5. Defendants operated a secret conspiracy to fix, raise, stabilize, and maintain prices in the NPK Fertilizer Market from at least January 1, 2021, until the present. Defendants designed and conducted their conspiracy to keep it secret, while at least some Defendants misleadingly stated their industry was "highly competitive."

6. Accordingly, Plaintiff individually and on behalf of all others similarly situated (the "Class," as defined below), brings this Class Action Complaint for damages and injunctive relief against Defendants Nutrien Ltd; Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Industries, LLC, d/b/a Koch Inc.; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever,

LLC; Koch Fertilizer, LLC; Koch Agronomic Services, LLC; Yara International ASA; Yara North America, Inc.; and The Mosaic Co. (collectively "Defendants"). Plaintiff makes the following allegations based on actual knowledge as to his own actions, facts, and circumstances, and upon information and belief and the reasonable investigation of counsel as to other allegations.

## JURISDICTION AND VENUE

7. Plaintiff brings this antitrust class action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to restrain Defendants' continuing violation and to recover treble damages and the costs of suit, including reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class, and for such other relief afforded under the laws of the United States for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

8. This Court has subject matter jurisdiction based on 28 U.S.C. §§ 1331, 1332(d), and 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). The Court has jurisdiction over Plaintiff's claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

9. The Court also has original jurisdiction over this lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) and (6), because Plaintiff is a citizen of a state different from that of one or more of the Defendants; the Class has more than 100 members; the aggregate amount in controversy exceeds five million dollars, exclusive of attorney's fees, interest and costs; and Class Members reside across the United States.

10. The Court has personal jurisdiction over the Defendants based on Fed. R. Civ. P. 4(d) and Section 12 of the Clayton Act (15 U.S.C. § 22), which authorizes nationwide service of process and confers personal jurisdiction over a defendant who has sufficient minimum contacts with the United States as a whole. When Congress has enacted such a nationwide service of process statute, personal jurisdiction exists whenever the defendant has sufficient minimum contacts with

the United States to satisfy the Fifth Amendment's due process requirements. Exercising personal jurisdiction over a defendant is proper under the Fifth Amendment Due Process Clause when, as here, the defendant and the conduct at issue bear a meaningful relationship to the United States. Defendants have a meaningful relationship with the United States through their or their subsidiaries' operation in the country and their sale of NPK Fertilizers throughout the United States. The United States and its courts, including this Court, have a clear interest in adjudicating anticompetitive conduct occurring in the United States that affects United States commerce and United States businesses and consumers. Defendants are sophisticated and substantial organizations with United States facilities or subsidiaries and have operations in this country, making it fair for them to litigate in this District.

11. Alternatively, the Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed NPK Fertilizer into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Defendants imposed unlawful overcharges for NPK Fertilizers and caused antitrust injury within this jurisdiction. Defendants' antitrust conspiracy was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

12. Venue is proper in this District under 28 U.S.C. § 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period Defendants transacted business in this District,

and a substantial portion of the activity at issue in this case occurred in this District. For example, CF Industries Holdings, Inc. operates its corporate headquarters in this District.

13. Defendants' conduct alleged herein occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

14. During the Class Period, Defendants produced and sold NPK Fertilizers in a continuous and uninterrupted flow of interstate commerce, which included manufacturing and selling NPK Fertilizers in this District and employing sales and other personnel in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

15. No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

### A. PLAINTIFF

16. Plaintiff Casey Carroll is a citizen of Florida. Casey Carroll purchased NPK Fertilizer directly from one or more of the Defendants at artificially inflated prices during the Class Period. Casey Carroll suffered an antitrust injury as a direct result of the antitrust violations alleged in this Complaint. This Complaint refers to Casey Carroll as "**Plaintiff**."

**B. DEFENDANTS**

**1. Nutrien Defendants**

17. Defendant Nutrien Ltd. is a corporation organized under the laws of Saskatchewan, Canada, with its principal executive offices in Saskatoon, Saskatchewan. Nutrien is the resulting entity from the 2018 merger of Agrium and Potash Corporation of Saskatchewan.[4]

18. Defendant Nutrien Ag Solutions is a Delaware corporation with its principal executive offices in Loveland, Colorado, and it is a wholly owned subsidiary of Nutrien Ltd. Alternately or in addition, Nutrien Ag Solutions is Nutrien Ltd's global retail division. Nutrien Ag Solutions' LinkedIn page describes itself as "[o]perated by Nutrien Retail, Nutrien Ag Solutions is a unit of Nutrien Ltd., the world's largest agricultural inputs company."[5] On Nutrien Ag Solution's LinkedIn page the company claims to have over 10,000 employees.

19. This Complaint refers to Nutrien Ltd. and Nutrien Ag Solutions collectively as "**Nutrien**."

**2. CF Industries**

20. Defendant CF Industries Holdings, Inc. is a Delaware corporation with its principal executive offices in Northbrook, Illinois. CF Industries is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF). This Complaint refers to CF Industries Holdings, Inc. as "**CF Industries**."

**3. Koch Defendants**

21. Koch Inc. is a Kansas corporation with its headquarters in Wichita, Kansas. On August 29, 2024, Koch Industries, LLC, announced it would thereafter go by the name of Koch,

---

[4] *Agrium*, Linkedin, https://www.linkedin.com/company/agrium (accessed March 11, 2026).

[5] *Nutrien Ag Solutions,* Linkedin, https://www.linkedin.com/company/nutrien-ag-solutions (accessed March 9, 2026).

Inc.,[6] consistent with the Kansas Secretary of State's website records indicating a merger and "conversion" in July 2024. Therefore, Koch, Inc., is the surviving entity and successor of its merger with Koch Industries, LLC.

22. Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. Koch Ag & Energy Solutions, LLC, is an indirect wholly owned subsidiary of Koch Industries, Inc. Koch Ag & Energy Solutions, LLC offers fertilizer, agronomic, and other services to its customers.[7] A 2024 press release from this entity indicated it had invested $2 billion in North American fertilizer production facilities, and was spending another $3.6 billion to acquire its new plant in Wever, Iowa.[8]

23. Koch Fertilizer Wever, LLC, is a Delaware limited liability company with its principal executive office in Wichita, Kansas. On August 29, 2024, Koch Ag & Energy Solutions announced it acquired the Wever, Iowa fertilizer plant from OCI Global for $3.6 billion.[9] Therefore, Koch Fertilizer Wever, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

24. Defendant Koch Fertilizer, LLC is a Kansas Domestic Limited Liability Company with its principal executive offices in Wichita, Kansas. Koch Fertilizer, LLC, "and its subsidiaries

---

[6] *See* Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, PR Newswire (Aug. 29, 2024), https://www.prnewswire.com/news-releases/koch-ag--energy-solutions-completes-acquisition-of-wever-iowa-fertilizer-plant-302234228.html (accessed March 19, 2026); *see also Koch Inc: Overview*, Global Data, https://www.globaldata.com/company-profile/koch-industries-inc/ (accessed March 19, 2026) ("Koch Inc. (Koch) previously Koch Industries, LLC is a diversified multinational corporation engaged in a wide range of industrial activities.").

[7] *Koch Ag & Energy Solutions,* Crunchbase, https://www.crunchbase.com/organization/koch-ag-energy-solutions (accessed March 19, 2026).

[8] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, *supra.*

[9] *Id*.

are collectively one of the world's largest producers and marketers of fertilizers" with the ability "to manufacture, market and distribute more than 13 million metric tons of fertilizer products annually." Koch Fertilizer owns or has interests in fertilizer plants in the United States and Canada, has a global distribution system including state-of-the-art terminals in the United States, and sells fertilizers including ammonia, urea, UAN, phosphate, potash, and sulfur-based products. [10] Koch Fertilizer, LLC, and its affiliates "own or have interests in nitrogen fertilizer plants in the United States" and other locations.[11] Koch Fertilizer, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.[12]

25. Defendant Koch Agronomic Services, LLC is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. "Koch Agronomic Services, LLC and other subsidiaries of Koch Fertilizer, LLC have become one of the world's largest networks for manufacturing and marketing value-added fertilizer products."[13] Therefore, Koch Agronomic Services, LLC, is a wholly owned subsidiary of Koch Fertilizer, LLC.

26. This complaint refers to Koch Industries, LLC; Koch, Inc.; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC collectively as "**Koch Defendants**."

---

[10] *Koch Fertilizer, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-fertilizer-llc (accessed March 9, 2026).

[11] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant, supra.*

[12] *See id.* ("Koch Ag & Energy Solutions, LLC and its subsidiaries, including Koch Fertilizer, Koch Agronomic Services, Koch Energy Services and Koch Methanol, are global providers of value-added solutions for the agriculture, energy, and chemical markets.").

[13] *Koch Agronomic Services, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-agronomic-services (accessed March 9, 2026).

**4. Yara Defendants**

27. Defendant Yara International ASA is incorporated in The Kingdom of Norway with its principal executive offices in Oslo, Norway. Yara International ASA is publicly traded, listed on the Oslo Stock Exchange (YAR:OL), and has registered American Depositary Receipts in the United States. Yara International ASA produces and markets fertilizers and related solutions and collected $13.9 billion in 2024 revenue.

28. Defendant Yara North America Inc. is a privately held Delaware corporation with its principal executive offices in Tampa, Florida. Yara North America, Inc. "manufactures fertilizers and agricultural chemicals and offers animal feeds, soluble fertilizers, and farm supplies."[14] A 2010 press release stated Yara International ASA had agreed to acquire Terra Industries, Inc. for approximately $4.1 billion and convert Terra Industries into its wholly-owned subsidiary named Yara North America.[15] Zoominfo has estimated Yara North America's income at $72.5 million per year and reported its website is www.yara.us.[16]

29. This Complaint refers to Yara International ASA and Yara North America Inc. collectively as "**Yara**."

**5. Mosaic Defendants**

30. Defendant The Mosaic Co. (NYSE: MOS) is a Delaware corporation with its principal offices in Tampa, Florida. The Mosaic Co. is a vertically integrated business engaged in

---

[14] *Yara North America*, Crunchbase, https://www.crunchbase.com/organization/yara-north-america (accessed March 9, 2026)

[15] Press Release, Terra Industries Inc. *Terra Industries to be Acquired by Yara International for US$41.10 per Share in Cash*, Securities and Exchange Commission Archives, https://www.sec.gov/Archives/edgar/data/722079/000095012310012769/c56322exv99w1.htm (accessed March 9, 2026).

[16] *Yara North America*, Zoominfo, https://www.zoominfo.com/c/yara-north-america-inc/1123348659 (accessed March 11, 2026).

all phases of crop nutrition including producing and selling phosphate and potash.[17] This Complaint refers to The Mosaic Co. as "**Mosaic**."

### C. AGENTS AND CO-CONSPIRATORS

31. The Defendants' anticompetitive and unlawful acts alleged in this Complaint were authorized, ordered, or performed by Defendants' respective officers, agents, employees, or representatives while they actively engaged in the management, direction, or control of Defendants' businesses or affairs. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

32. Each corporate Defendant's agents operated under the authority and apparent authority of its respective principals.

33. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

34. Various persons and/or firms not named as Defendants herein participated as co-conspirators in the violations alleged herein and likely performed acts and made statements in furtherance thereof.

35. Each Defendant acted as the principal or agent of, or for, the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

36. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Defendants' conspiracy involved Defendants'

[17] *Mosaic*, Crunchbase, https://www.crunchbase.com/organization/the-mosaic-company (accessed March 9, 2026).

reliance that other corporate families would act consistently with their agents' statements about prices and production. Because Defendants operate and market themselves as corporate families, individual participants in the conspiratorial acts did not often know or identify the corporate affiliations of themselves or their counterparts, nor did they recognize the technical distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to raise and maintain supra-competitive prices of NPK Fertilizers.

37. Canpotex Limited is a private joint venture owned by Nutrien Ltd. and Mosaic Canada Corp. Nutrition, LP (a wholly-owned subsidiary of Mosaic). Canpotex Limited maintains its principal executive offices in Saskatoon, Saskatchewan, Canada. In a 2020 letter to the United States Securities and Exchange Commission, Mosaic's Controller Lydia A. Burke explained that Canpotex Limited is a Saskatchewan export association owned by Mosaic and Nutrien. Each owner's relative economic interest in the joint venture "dictates the relative volumes of potash product" they sell to Canpotex. These ownership interests can be adjusted as the owners "add peaking capacities."

38. Canpotex's board of directors includes representatives of both Mosaic and Nutrien.[18] Mosaic has explained that it does not consolidate Canpotex's accounting with its own accounting, but rather records its equity investment "using the equity method of accounting."[19] Canpotex ships potash into the United States by rail and operates shipping terminals in Portland, Oregon and Thunder Bay, Ontario. This Complaint refers to Canpotex Limited as "**Canpotex**."

---

[18] Letter, Lydia A. Burke, Mosaic, to Securities and Exchange Commission regarding Mosaic Form 10-K for Fiscal Year Ended December 31, 2019 (Aug. 17, 2020), https://www.sec.gov/Archives/edgar/data/1285785/000124378620000111/filename1.htm (accessed March 9, 2026)

[19] *Id.*

39. In a previous price-fixing case, the Seventh Circuit Court of Appeals noted the plaintiffs' claim that Canpotex facilitated that price-fixing arrangement by providing Mosaic, Agrium, and PCS with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*), *cert. dismissed*, 570 U.S. 935 (2013).

## II. FACTUAL ALLEGATIONS

### A. Making and Selling NPK Fertilizers in the NPK Fertilizers Market.

40. The three primary nutrients for fertilizer are nitrogen, phosphorus, and potassium,[20] making them the "**NPK Fertilizers"** sold commercially. Calcium, sulfur, and magnesium are used less often.

41. The first NPK Fertilizer is nitrogen (chemical symbol "N"), which accounted for approximately 59% of the world's 2024 fertilizer nutrient consumption. An early step in making nitrogen-based fertilizers is mixing nitrogen from the air with hydrogen from natural gas at high pressures and high temperatures to create ammonia. The ammonia is used to make nitric acid. Producers then mix the nitric acid to create nitrate fertilizers such as ammonium nitrate. Producers may instead mix ammonia with liquid carbon dioxide to create urea. Mixing those products with water can also form urea ammonium nitrate. Commercial nitrogen fertilizer versions include ammonium nitrate (AN), anhydrous ammonia ($NH_3$), urea, and urea-ammonium nitrate (UAN).[21]

---

[20] *Fertilizer Industry Worldwide – Statistics & Facts*, Statista (Dec. 17, 2025), https://www.statista.com/topics/8956/fertilizer-industry-worldwide/#topicOverview (accessed March 8, 2026).

[21] *How Fertilizers are Made*, Fertilizers Europe, https://www.fertilizerseurope.com/fertilizers-in-europe/how-fertilizers-are-made/ (accessed March 8, 2026); Fabian G. Fernandez, *The Three Biggies: Urea, Anhydrous Ammonia, and UAN* Minnesota Crop News (Jan. 1, 2024), https://blog-crop-news.extension.umn.edu/2016/05/the-three-biggies-urea-anhydrous.html (accessed March 18, 2026).

42. The second NPK Fertilizer is fertilizer made from phosphorus. Pure phosphorus contains only the chemical element (chemical symbol "P"). The term "phosphate" in a stricter sense means a compound ($P_2O_5$) containing phosphorus and oxygen, but the terms phosphorus and phosphate are often used interchangeably, and writers often use the term phosphate in the context of fertilization.[22]

43. Phosphorus fertilizers come from mined ores.[23] The world's four largest phosphorus or phosphate producing countries are China, Morrocco, the United States, and Russia. In the United States, Florida, North Carolina, Idaho, and Utah have mines producing phosphate. Mosaic operates three phosphate mines in Florida and Nutrien operates phosphate mines in North Carolina and Utah.[24]

44. Phosphate mines in central Florida typically range in size from approximately 5,000 to 10,000 acres. Phosphate mining disturbs 3,000 to 6,000 acres per year in Florida, about 25% to 30% of which are wetlands or other surface waters. Miners use dragline buckets to scoop up the top 15 to 30 feet of soil, which they dump in piles beside the mine pit. "The dragline then digs out the ore-bearing layer (known as the matrix), which consists of about equal parts phosphate rock, clay and sand." High-pressure water guns in a pit create a slurry that the mining company transfers to a beneficiation plant, which separates the slurry's phosphate from the clay and sand. After a further trip by rail, the phosphate is processed for fertilizer use at a separate plant.[25]

---

[22] *Phosphorus (P) versus Phosphate (P2O5)*, Eurofins Agro, https://www.eurofins-agro.com/en/phosphorus-vs-phosphate (accessed March 19, 2026).

[23] *How Fertilizers Are Made, supra.*

[24] Melissa Pistilli, *Top 10 Phosphate Countries by Production*, Investing News Network (Aug. 25, 2025), https://investingnews.com/daily/resource-investing/agriculture-investing/phosphate-investing/top-phosphate-countries-by-production/ (accessed March 10, 2026).

[25] *Florida's Phosphate Mines*, Florida Department of Environmental Protection, https://floridadep.gov/water/mining-mitigation/content/phosphate (accessed March 10, 2026).

45. To make the fertilizer, the manufacturer treats the phosphate rock, primarily with sulphuric acid, which makes phosphoric acid. Companies either use phosphoric acid in a concentrated form or mix it with ammonia for various phosphate fertilizers. Commercial phosphate fertilizers include single super phosphate (SSP), Mono- and diammonium phosphate (MAP or DAP), and triple superphosphate (TSP).[26]

46. The third NPK Fertilizer, called "Potash," comes from potassium (chemical symbol "K"). Companies use mined ores to make potassium fertilizer.[27] Several mined and manufactured salts with potassium are commonly called "Potash." Potassium chloride (chemical formula KCl) accounts for about 90% of worldwide agriculture's potassium. Potassium nitrate, potassium sulfate, and potassium-magnesium salts are other widely-used potassium products. After mining the potassium-bearing minerals from underground deposits, producers prepare and purify them using dry and slurry processes.[28] Commercial potash fertilizer products include muriate of potash (MOP), potassium nitrate (KN), and sulphate of potash (SOP).[29]

47. In 2023, the United States consumed 20.13 million metric tons of fertilizer nutrients. The United States was the fourth-largest fertilizer-consuming country, behind China,

---

[26] *How Fertilizers Are Made*, *supra*.

[27] *Id.*

[28] *Manufacturing Process of Potassium Fertilizers*, Valco, https://www.valcogroup-valves.com/faq-2/potassium-fertilizers-manufacturing-process-of-potassium-fertilizers/ (accessed March 10, 2026).

[29] *How Fertilizers are Made, supra.*

India, and Brazil.[30] The United States' and Europe's fertilizer markets are considered mature markets.[31]

48. Fertilizer production features major global chemical producers like Defendants that possess substantial production capacities. For example, Nutrien "leads globally in potassium chloride production capacity, at 21 million metric tons." CF Industries has the biggest ammonia plant capacity, with 9.5 million metric tons, followed by Yara. STATISTA noted that "[t]hese capacities underscore the dominance of a few major players in meeting the world's demand for critical agricultural inputs[.]"[32]

49. NPK Fertilizer producers ship and sell their fertilizer across the United States. Many fertilizer sales require shipping from large, centralized factories to distributors, retailers, and other customers.

50. For example, CF Industries has five manufacturing plants in the United States as well as 24 distribution facilities located "in the American heartland." One description emphasized its sales to agricultural retailers. CF Industries' Chief Information Officer told FORBES that CF Industries has a production plant and shipping terminal facility in Donaldsonville, Louisiana. The company may lease storage space along major roads, rivers, and rail lines. For example, it can "put one, two, three barges on a river headed toward Ohio if [it] expect[s] a demand spike there." The

---

[30] Doris Dokua Sasu, *Global Consumption of Fertilizers 2023, by Country,* Statista (Dec. 10, 2025), https://www.statista.com/statistics/1287852/global-consumption-fertilizer-by-country/ (accessed March 8, 2026).

[31] *See Fertilizer Industry Worldwide – Statistics & Facts*, Statista (Dec. 17, 2025), https://www.statista.com/topics/8956/fertilizer-industry-worldwide/#topicOverview (accessed March 8, 2026) (anticipating stable fertilizer demand "in mature markets such as Europe and North America").

[32] Doris Kokua Sasu, *Global Fertilizer Production 2005-2023, by Nutrient*, Statista (Dec. 15, 2025), https://www.statista.com/statistics/1290786/global-fertilizer-production-by-nutrient/ (accessed March 10, 2026).

company uses barges, rail cars, and trucking, and in 2019 was adding Enterprise Resource Planning (ERP) software tools to plan logistics and shipping.[33] Another report notes CF Industries sells ammonia products, nitrogen products, and nitric acid products, and "serves cooperatives, retailers, independent fertilizer distributors, traders, wholesalers, and industrial users."[34]

51. Mosaic mines phosphate rock in Florida, as well as Brazil and Peru. It processes the rock into finished phosphate products at plants in Florida and Louisiana, as well as Brazil. It mines potash in Saskatchewan, New Mexico, and Brazil.[35]

52. Mosaic operates a limited number of potash mines and concentrates plants for phosphate production and uses truck, rail, barge, and ship transportation methods. Mosaic owns warehouse distribution facilities in Pekin, Illinois, Henderson, Kentucky, and Rosemount, Minnesota. It leases distribution facilities in California, Florida, Illinois, Indiana, Iowa, Kentucky, Louisiana, Minnesota, Missouri, Nebraska, North Dakota, Ohio, Oklahoma, Texas, and Wisconsin.[36]

53. Mosaic reportedly produces concentrated phosphate and potash and has vertically integrated mining resources producing "crop nutrients, feed, and industrial products for customers around the globe." Its customer base includes individual growers, retail dealers, and wholesalers

---

[33] Jim Vinoski, *To Get an Edge With a Commodity Product, Fertilizer Giant CF Industries Relies on Distribution*, FORBES (Feb. 8, 2019), https://www.forbes.com/sites/jimvinoski/2019/02/08/this-fertilizer-manufacturers-competitive-advantage-their-distribution-model/ (accessed March 9, 2026),

[34] *CF Industries Holdings, Inc.*, Yahoo!finance, https://finance.yahoo.com/quote/CF/profile/ (accessed March 9, 2026).

[35] The Mosaic Company, Annual Report (Form 10-K) at 1 (2024).

[36] *Id*. at 14.

in over 40 countries.[37] Its products include potash fertilizers, phosphate fertilizers, performance fertilizers, and animal feed products.

54. Yara operates two production sites in the California area, five production sites along the United States East Coast, and joint ventures in the Eastern Midwest and on or near the Gulf Coast, as shown in Yara's Capital Market's Day map for investors.[38]




[37] *Mosaic*, Crunchbase, https://www.crunchbase.com/organization/the-mosaic-company (accessed March 9, 2026).

[38] *Yara International ASA (YARIY) Analyst/Investor Day – Slideshow*, Seeking Alpha (Jan. 9, 2026), https://seekingalpha.com/article/4858275-yara-international-asa-yariy-analyst-investor-day-slideshow (accessed March 11, 2026).

55. The following image breaks out a close-up of the United States' region.



56. Other direct purchasers of NPK Fertilizers include golf courses, nurseries, and landscapers.

57. Defining a relevant market is unnecessary for this case because Defendants' price-fixing constitutes a *per se* antitrust violation. However, for clarity, the relevant product market is the market for NPK Fertilizers, which includes the sale of fertilizers containing material amounts of nitrogen, phosphorus, or potassium. Additionally, or alternatively, individual submarkets exist for Nitrogen Fertilizers, Phosphorus Fertilizes, and Potash Fertilizers. The relevant geographical market is the United States.

**B. Defendants Sharply Raised NPK Fertilizer Prices.**

58. From about 2015 to 2020, just before the start of Defendants' current conspiracy, NPK Fertilizer's price fluctuations appear transitory, consistent with a competitive market, as shown in the following graph of the Producer Price Index for fertilizer manufacturing.[39]




59. As suggested by the graph, because of Defendants' price hikes, NPK Fertilizer prices increased substantially in 2021 and 2022, contrary to the previous pricing pattern, and have remained elevated.[40] In 2021, fertilizer prices "surged dramatically," with United States farmers paying fertilizer prices that increased over 65%. Nitrogen fertilizer prices jumped 95% and potash prices rose over 70%. These price increases "added an estimated $128,000 in costs per farm for feed grain operations in 2022."[41]

---

[39] *Producer Price Index by Industry: Fertilizer Manufacturing*, Federal Reserve of St. Louis, (updated Feb. 27, 2026), https://fred.stlouisfed.org/series/PCU3253132531 (accessed March 8, 2026).

[40] *Id.*

[41] Frank DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion*, *supra*.

60. Disclosures to their investors by publicly traded Defendants admit they raised prices significantly starting in 2021.

61. For nitrogen, in an earnings release filed with the Securities and Exchange Commission on February 15, 2023, Nutrien disclosed its nitrogen price increases per tonne from 2021 to 2022. Nutrien stated ammonia prices rose from $477 per tonne in 2021 to $973 per tonne in 2022. Urea prices increased from $478 per tonne in 2021 to $696 in 2022. Prices for nitrates and other nitrogen fertilizers rose from $238 in 2021 to $402 per tonne in 2022.[42]

62. In an annual report filed eight days after Nutrien's disclosure, CF Industries, which focused on nitrogen fertilizers, disclosed that its products' average selling price in 2021 was $353 per ton. In 2022, its average selling price rose to $610 per ton.[43]

63. As to phosphate fertilizers, Nutrien's February 15, 2023 earnings release disclosed its average price for phosphate fertilizer increased from $602 per tonne in 2021 to $806 per tonne in 2022.[44]

[42] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results,* Seeking Alpha (Feb. 15, 2023), https://seekingalpha.com/filing/7245831 (accessed March 18, 2026). A "tonne" means a metric Ton, equal to 1,000 kg or 2,204.6 pounds; a short "ton" equals 2,000 pounds. *What's the Difference Between Ton and Tonne? Which One Is Heavier?* Asset Management Engineers (April 4, 2018), https://www.asseteng.com.au/blog/whats-difference-ton-tonne-one-heavier/ (accessed March 20, 2026).

[43] CF Industries Holdings, Inc., Annual Report (Form 10-K) at 31 (filed Feb. 23, 2023 for period ending Dec. 31 2022), Seeking Alpha (Feb. 23, 2023), https://seekingalpha.com/filings/pdf/16427898 (accessed March 18, 2026).

[44] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results, supra.*

64. Mosaic also disclosed phosphate fertilizer price increases. Mosaic's earnings release for 2022 disclosed on February 22, 2023, that its average selling price rose from $618 per tonne in 2021 to $913 per tonne in 2022.[45]

65. Public Defendants also disclosed price increases for potash fertilizer. Nutrien's February 15, 2023 earnings release reported that its average year-over-year potash price rose from $317 per tonne in 2021 to $667 per tonne in 2022.[46]

66. Mosaic also disclosed a price increase. Mosaic's February 22, 2023 earnings release disclosed that its average 2021 selling price for MOP was $285. In 2022, Mosaic increased its average MOP selling price to $632.[47]

67. Reflecting those price increases, revenues of four publicly traded Defendants climbed substantially in 2021 and 2022, as shown in the following graph.[48]

---

[45] *Mosaic Company Reports Fourth Quarter and Full Year 2022 Results*, (Feb. 22, 2023) https://s1.q4cdn.com/823038994/files/doc_financials/2022/q4/FINAL_Press-Release-Q4-2022-_305PM.pdf (accessed March 13, 2026).

[46] *Nutrien Reports Fourth Quarter and Full-Year 2022 Results, supra.*

[47] *Mosaic Company Reports Fourth Quarter and Full Year 2022 Results, supra.*

[48] Compiled from Seeking Alpha, https://seekingalpha.com/ (accessed March 10, 2026) (in millions of US dollars).




68. Increasing fertilizer prices reportedly led fertilizer manufacturers to post substantial profit increases. "For example, Mosaic's net earnings totaled $842 million in the first nine months of 2022, representing an increase in profits of 217% over the same amount of time last year." CF Industries "had $2.49 billion over the first nine months of 2022—a 1,075% bump compared to the same amount of time last year."[49]

69. Consistent with those comments, net incomes of four publicly traded Defendants also spiked in 2021 and 2022, as displayed in the following graph:[50]

[49] Monica Cordero, *Farmers Endured a Rough Year, but Fertilizer Companies Cashed In*, Investigate Midwest, https://investigatemidwest.org/2022/12/22/farmers-endured-a-rough-year-but-fertilizer-companies-cashed-in/ (accessed March 9, 2026).

[50] Compiled from Seeking Alpha, https://seekingalpha.com/ (accessed March 11, 2026) (in millions of US dollars).




70. Defendants' substantial profit increases show that changes in input costs do not explain Defendants' price increases. For example, changes in natural gas price accounted for only about 19% of the nitrogen price increase from April 2021 to April 2022.[51]

71. Defendants explained that their selling prices more than offset the increase in their input costs. For example, CF Industries said their net earnings grew by $3.47 billion to $5.86 billion in 2022, "due primarily to higher average selling prices *partially* offset by higher natural gas costs."[52] It explained its 73% average selling price increased margin by $4.80 billion, while increased natural gas costs reduced margin by approximately $1.05 billion.[53]

72. Defendants' sharp increase in profits was disproportionate to any increased production costs. Nutrien's cost of goods sold increased 24% in 2022, while its profits rose 142%.

---

[51] Bart L. Foscher, et al, *Concentration and Competition in the U.S; Fertilizer Industry,* Agricultural and Food Policy Center, Texas A&M University (March 2024), file:///C:/Users/daviscs/Downloads/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf (accessed March 17, 2026),

[52] Annual Report (Form 10-K), CF Industries Holdings, Inc. at 31 (emphasis added).

[53] *Id.* at 34.

That year CF Industries' costs rose 28% while its profits increased 212%. Mosaic's cost of sales rose 46%, but its profits rose 120%.[54]

73. Prices for NPK Fertilizers rose sharply during the Class Period and remained elevated for extended periods. These price increases persisted even as key input prices declined. Such price behavior is inconsistent with competitive market dynamics and indicates coordinated conduct in the industry.

74. As suggested by the changed pricing patterns, Defendants dramatically increased their prices and imposed supra-competitive prices on Plaintiff and other Class members due to Defendants' collusive agreement and its implementation.

**C. The Department of Justice Investigation into Fertilizer Price-Fixing.**

75. The United States Department of Justice recently commenced an investigation into potential price collusion by the leading commercial fertilizer producers. "The probe targets CF Industries Holdings Inc. (NYSE:CF), Nutrien Ltd (NYSE:NTR), The Mosaic Company (NYSE:MOS), Koch Inc., and Norway's Yara International ASA, which collectively control most nitrogen-based fertilizer sold in the U.S. and dominate potash and phosphate markets."[55]

76. News of this investigation follows on the heels of industry complaints about high fertilizer prices that industry participants suspected were above competitive levels. On February 4, 2026, the Iowa Corn Growers Association sent a letter to Attorney General Pam Bondi. The letter asked her to direct the Department of Justice's Antitrust Division to report to her on its

---

[54] Noah Zahn, *Fertilizer Companies Cash In While Farmers Struggle,* WUFT [(c) 2026], https://projects.wuft.org/priceofplenty/profit/the-cost-of-growth-fertilizer-companies-cash-in-while-farmers-and-communities-struggle/ (accessed March 14, 2026).

[55] DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion, supra*; Rob Williams, *Justice Department Investigates Fertilizer Producers Over Possible Price Collusion*, *supra.*

findings related to fertilizer pricing.[56] A little over two weeks later, on February 19, 2026, the Texas Agriculture Daily reported that the Texas Corn Producers Association had recently sent a similar letter to Attorney General Bondi, asking if the Department of Justice was doing anything about fertilizer prices.[57]

77. Nutrien's Annual Information Form for the year ended December 31, 2025, acknowledged that "The US Department of Justice has recently launched antitrust investigations into pricing practices within the agricultural industry." It also stated, "Changes in antitrust laws, trade agreements, or regulations may limit our operations or the operations of Canpotex and could negatively impact opportunities for future acquisitions or organic growth."[58]

78. The United States Department of Agriculture has recently noted concerns about collusion in the NPK Fertilizer Market. In a January 2026 webcast, Deputy Agriculture Secretary Stephen Vaden reportedly "accused Nutrien and Mosaic of working to 'collude' to limit U.S. fertilizer supply and control prices, suggesting that the administration could take future action to inject more competition into markets, if necessary."[59]

---

[56] *Iowa Corn's Post*, Facebook (Feb. 5, 2026), https://www.facebook.com/IowaCorn/posts/the-iowa-corn-growers-assocation-sent-a-letter-to-attorney-general-pamela-bondi-/1324661399704671/ (accessed March 17, 2026).

[57] Jessica Domel, *Corn Growers Ask for Update on Fertilizer Investigation*, Texas Agriculture Daily (Feb. 15, 2026), https://texasfarmbureau.org/corn-growers-ask-for-update-on-fertilizer-investigation/ (accessed March 17, 2026).

[58] Nutrien Ltd., Annual Information Form at 24 (Year Ended December 31, 2025); *see Nutrien Files 2025 Annual Disclosures,* Seeking Alpha [citing Business Wire] (Feb. 27, 2026), https://seekingalpha.com/pr/20417883-nutrien-files-2025-annual-disclosures (accessed March 16, 2026) (announcing filing of Annual Information Form).

[59] Ryan Hanrahan, *USDA's Vaden Accuses Nutrien, Mosaic of Fertilizer Price Collusion*, Successful Farming (Updated Jan. 26, 2026), https://www.agriculture.com/partners-usda-s-vaden-accuses-nutrien-mosaic-of-fertilizer-price-collusion-11892276 (accessed March 9, 2026).

79. Courts properly consider a government investigation, along with other facts, as one factor supporting the plausibility of an antitrust complaint. Here, the above allegations indicate that Mosaic, Nutrien, CF Industries, Koch, and Yara are specific targets of the government investigation.

**D. Plus-Factors Show the Prime Fertilizer Market is Susceptible to Cartelization.**

80. Antitrust regulators and economists recognize certain characteristics that make markets more susceptible to collusion, for example, by making collusion more efficient or more profitable. Such "plus factors" are facts, in addition to parallel conduct that, together with all the circumstances, support the existence and operation of a price-fixing conspiracy. The NPK Fertilizer industry displays several such factors making Defendants' conspiracy more likely to be afoot.

**1. <u>Concentrated Market</u>**

81. Cartels are more likely to develop in concentrated markets. A concentrated market with few suppliers controlling large market shares facilitates collusion in at least five ways. First, it gives a cartel of sellers more collective bargaining power by reducing buyers' alternatives. Second, communicating and agreeing upon collective action among fewer sellers requires less time and attention. Third, monitoring and policing the agreement among a smaller group of sellers is easier. Fourth, higher cartel market shares have been associated with higher overcharges. Fifth, because cartelists in a concentrated market receive a higher percentage of the cartel's profits, they have less incentive to cheat on the cartel's agreement to gain market share.

82. The NPK Fertilizer Market is highly concentrated. This concentration has increased over four decades. For example, the number of nitrogen fertilizer producers declined from 46 to

13 between 1984 and 2007, a reduction of 72%. Four firms control 75% of the United States nitrogen fertilizer market, and two firms control nearly all of the United States potash market.[60]

83. The Herfindahl-Hirschman Index (HHI) illustrates the level of an industries' concentration. The NPK Fertilizer Markets' HHIs show substantial concentration, with 4,553 for phosphate, 3,455 for potash, and 2,382 for potash. Index levels over 2,500 are considered highly concentrated.[61]

84. The following table shows the four-firm concentration ratio for the three NPK Fertilizers for the United States, North America, and the world.[62]

| **Four-Firm Concentration Ratio for Fertilizers by Geographic Scope** | | | |
|---|---|---|---|
| | United States | North America | World |
| Potash | 100% | 99% | 84% |
| Nitrogen | 77% | 77% | 13% |
| Phosphate | 100% | 100% | 25% |

85. The following table show the Herfindahl-Hirschman Index for the four fertilizers, again by geographical scope.[63]

| **Herfindahl-Hirschman Index (HHI) For Fertilizers by Geographic Scope** | | | |
|---|---|---|---|
| | United States | North America | World |
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

[60] DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion, supra*.

[61] *Id.* (summarizing Texas A&M Agricultural and Food Policy Center research); Williams, *Justice Department Probes Fertilizer Giants for Possible Price Collusion, supra* (citing similar findings Nutrien and Mosaic control about 90% of United States potash and phosphate production and Koch, CF Industries, Nutrien, and Yara together control approximately 83% of the nitrogen fertilizer supply).

[62] Bart L. Foscher, et al., *Concentration and Competition in the U.S; Fertilizer Industry,* at 10 Agricultural and Food Policy Center, Texas A&M University (March 2024), file:///C:/Users/daviscs/Downloads/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf (accessed March 17, 2026) (Table 3).

[63] *Id.* (Table 2).

86. As the tables show, the United States NKP Fertilizer Market is highly concentrated, supporting the existence and operation of a cartel.

### 2. Barriers to Market Entry

87. High barriers to new companies' entering a market facilitate collusion in that market. Price increases and supra-competitive profits can attract other potential competitors, but high entry barriers make their market entry slower, riskier, and less likely to succeed, deterring and repelling additional competition.

88. In this case, to provide meaningful competition to the Defendants' established market positions, a new market entrant would need to produce fertilizers at a size to achieve economies of scale. Substantial fertilizer plants can readily cost millions of dollars. For example, in 2023, Koch Ag & Energy, the parent company of Koch Fertilizer, paid $3.6 billion to acquire the Iowa Fertilizer Company and its plant in Wever, Iowa. At the time, the plant employed 265 people and contracted with another 50 to 90 people for electrical, engineering, and service functions.[64]

89. For a smaller example, in 2025 a California firm announced it had obtained $10 million in project funding to expand its production capacity "to achieve commercial scale."[65]

### 3. Commodity Product

90. Homogenous commodity products make it easier for firms to collude to raise the price of those products. When all firms in the industry are producing the same products, it is easier

---

[64] Erin Jordan, *Koch Industries Buys Iowa Fertilizer Co. for $3.6 B*, The Gazette (Dec. 28, 2023), https://www.thegazette.com/news/agriculture/koch-industries-buys-iowa-fertilizer-co-for-3-6b/article_8d6abdb3-6440-5fcb-b516-e36dcbee979f.html (accessed March 10, 2026).

[65] *Nitricity Announces $10M in Fresh Funding for First-of-a-Kind Organic Fertilizer Plant in Central California*, Nitricity, (March 4, 2025), https://www.nitricity.co/news/nitricity-announces-10-million-in-fresh-funding-for-first-of-a-kind-organic-fertilizer-plant (accessed March 9, 2026).

for them to agree on prices for those products. Commodity products simplify cartelist's seeing whether their co-conspirators are cheating on a collusive agreement. Each conspirator can readily observe any rival's deviation from the agreed upon price for a commodity product, and a uniform product means such a deviation is cheating the cartel rather than adjusting for a difference in the rival product's quality or features.

91. NPK Fertilizers are commodity products that are frequently sold on a standardized basis. Mosaic noted that "[b]ecause crop nutrients are global commodities available from numerous sources, crop nutrition companies compete primarily on the basis of delivered price."[66] For example, potash is a "homogenous commodity: [o]ne manufacturer's supply is interchangeable with another's." *Minn Chem, Inc.,* 683 F.3d at 848 (noting that "Markets for this type of product are especially vulnerable to price-fixing").

**4. <u>Inelastic Demand</u>**

92. "Elasticity" describes the sensitivity of supply and demand to changes in price or quantity. Demand for a product is "elastic" if an increase in the product's price causes a large decline in the quantity sold of that product. Conversely, the product's demand is "inelastic" if an increase in its price results in only a small decline in the quantity sold of that product.

93. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would cause unduly declining sales, revenue, and profits as customers substitute products or decline to buy them. Therefore, inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering undue customer substitution and lost sales revenue. A product's

[66] The Mosaic Company, Annual Report (Form 10-K) at 15 (2024).

inelastic demand also encourages collusion because raising prices more than offsets reduced quantities sold.

94. "Nitrogen, phosphate, and potash are essential in the production of crops used for food, fiber, and fuel."[67] Because fertilizer can often make the difference between a good and bad harvest, "modern American crops have become dependent on fertilizer" after generations of farming using the same topsoil.[68] Given the importance of fertilizer to a successful crop year, farmers are willing to pay substantial amounts to keep buying fertilizer, giving it inelastic demand.

95. Defendant disclosures also support inelastic demand for these fertilizers. Discussing its phosphate sales, Mosaic stated:

> Sales volumes decreased from 7.7 million tonnes in 2021 to 6.6 million tonnes, reflecting the impact of Hurricane Ian as well as other unplanned operational outages. This decrease was more than offset by the rise in average realized selling prices to $913 per tonne, up from $618 in 2021.[69]

96. This shows Mosaic could raise prices without collecting less money, because the price increase more than made up for the decline in sales.

### 5. Fragmented Farmer Market

97. Having numerous buyers for a product supports seller collusion by giving the sellers more collective bargaining power and making it harder for buyers to monitor sellers' conduct. The farmers who purchase fertilizers are fragmented in this way.

---

[67] Richard Nehring, *Fertilizers & Pesticides*, USDA Economic Research Service, (Nov. 13, 2025), https://www.ers.usda.gov/topics/farm-practices-management/fertilizers-pesticides (accessed March 9, 2026).

[68] Cordero, *Farmers Endured a Rough Year, but Fertilizer Companies Cashed In*, *supra.*

[69] *Mosaic Company Reports Fourth Quarter and Full Year 2022 Results, supra.*

98. In 2022, the United States had 1,900,487 farms, which had an average of 463 acres. Farms had long been numerous and fragmented in that manner, since 2022 was the first year since before the Civil War that the United States had under two million farms.[70]

### 6. Opportunities to Collude

99. Opportunities for collusion facilitate price-fixing by providing cartelists with otherwise legitimate-appearing opportunities to discuss prices and production. Communications among competitors can therefore provide evidence of price-fixing. The fertilizer industry features a significant joint venture and trade association meetings that provide Defendants with opportunities to collude.

100. As noted above in this Complaint's section on Agents and Co-Conspirators, Nutrien and Mosaic and their affiliates together own and operate their Canpotex joint venture. Nutrien and Mosaic representatives sit together on Canpotex's board of directors. Canpotex buys potash products from Mosaic and Nutrien, and reduces its net earnings to a breakeven level by deducting costs from what it pays these companies to buy products. Each owners' relative economic ownership interest in Canpotex "dictates the relative volumes of potash product sold to Canpotex" and "can be adjusted as the shareholders add peaking capacities due to capital expansions."[71] The directors at least approve Canpotex's operating budget.[72] Canpotex necessarily involves the Mosaic and Nutrien representatives in discussing fertilizer prices and production and their own changes in production and production capacity. Canpotex provides ample opportunities to

---

[70] Andrew Keller, *2022 Census of Agriculture: Number of Farms Falls Below 2 million*, USDA Economic Research Service, (Feb. 28, 2024), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=108629 (accessed March 9, 2026).

[71] Lydia Burke Letter to Securities and Exchange Commission, *supra*.

[72] *See id.*

exchange other pricing information and to discuss and agree upon prices and production restrictions to maintain or increase prices. The Seventh Circuit previously noted the claim that Canpotex facilitated the earlier price-fixing arrangement by providing its then-owners Mosaic and Agrium with "access to one another's sensitive production and pricing information." *Minn-Chem*, *Inc.*, 683 F.3d at 850.

101. As noted in this Complaint's Government Investigation section, in January 2026, Deputy Agriculture Secretary Stephen Vaden essentially accused Mosaic and Nutrien of colluding through Canpotex.[73]

102. Canpotex and its parent companies can move the United States potash market. Canpotex exports over 13 million tonnes of potash per year,[74] acting as Mosaic's and Nutrien's exporter. From 2019 through 2023, the United States imported over 90% of its apparent potash use, making its potash market dependent on imports. From 2019 to 2022, Canada provided 77% of the potash that the United States imported.[75] Given Canadian potash's influence on the United States market, its major decisions about potash routing, timing, and allocation can affect the amount of comparable potash available for sale into or affecting the United States market.

103. The industry also gives Defendants opportunities to collude through various trade association events in the fertilizer industry. These opportunities include conventions and meetings of boards of directors on which the executives jointly sit.

---

[73] Ryan Hanrahan, *USDA's Vaden Accuses Nutrien, Mosaic of Fertilizer Price Collusion, supra.*

[74] *Our Markets*, Canpotex, https://www.canpotex.com/what-we-do/our-markets/ (accessed March 17, 2026).

[75] *Potash*, https://pubs.usgs.gov/periodicals/mcs2024/mcs2024-potash.pdf (accessed March 17, 2026).

104. For example, Defendants are active members of the International Fertilizer Association.[76] The International Fertilizer Association (IFA) states it is a "global fertilizer association" with around 500 members.[77] Executives from Defendants serve as permanent members of this organization's Board of Directors, including from CF Industries (Chris Bohn), Mosaic (Bruce Bodine), Nutrien (Kenneth Seitz), and Yara (Svein Tore Holsether).[78] (Various other board members are permanent or rotating board members).

105. International Fertilizer Association's 2021 Board of Directors members included Anthony Will (CF Industries), Mayo Schmidt (Nutrien Canada (resigned January 2022)), James O'Rourke (Mosaic), and Svein Tore Holsether (Yara International). Anthony Will and Svein Tore Holsether sat on the Executive Board.[79]

106. The association's web site shows upcoming events called the "Cultivating Tomorrow Conference" and the "IFA Annual Conference 2026," with the latter scheduled for June 29 to July 1, 2026.[80] Previous events include the IFA Annual Conference in Vienna on May 30 – June 1, 2022, and IFA Strategic Forum in Washington, D.C. on October 31 – November 1, 2022, and a Global Markets Conference in London from July 11-12, 2023.[81]

---

[76] *Our Members*, International Fertilizer Association, https://www.fertilizer.org/about-ifa/our-members/ (accessed March 11, 2026).

[77] International Fertilizer Association, https://www.fertilizer.org/ (accessed March 11, 2026).

[78] *Our Board*, International Fertilizer Association, https://www.fertilizer.org/about-ifa/structure-governance/our-board/ (accessed March 11, 2026)

[79] *2021 Annual Report,* at 6-8. International Fertilizer Association, https://www.fertilizer.org/wp-content/uploads/2023/01/2022_IFA_Annual_Report_2021.pdf (accessed March 23, 2026).

[80] *Events*, International Fertilizer Association, https://www.fertilizer.org/news-events/events/ (accessed March 11, 2026)

[81] *Past IFA Events*, International Fertilizer Association, https://www.fertilizer.org/news-events/events/past-ifa-events/ (accessed March 11, 2026).

107. The International Fertilizer Association held a virtual Global Sustainability Conference from March 9-11, 2021, with 454 delegates from 205 companies. IFA held its annual conference in Lisbon from September 27 – 29, 2021, which had 520 in-person delegates from 200 companies.[82]

108. International Fertilizer Association's website points to its "IFASTAT" as "a one-stop shop for the most comprehensive statistical information" on fertilizers.[83]

109. "IFA members benefit from access to detailed statistics about the fertilizer market, with 15 years of global production, trade, and supply data, almost 75 years of plant nutrient consumption data, and a selection of country profiles and factsheets." Association members "also receive detailed reports on medium-term and short-term supply and demand outlooks."[84] Market outlet summaries are available "to the public," indicating the short and medium-term data are only for members.

110. Another gathering point for the Defendants is The Fertilizer Institute, an industry organization with offices in Arlington, Virginia. Each of the Defendant families have executives sitting on the Fertilizer Institute's Board of Directors: Scott McGinn (Koch Fertilizer), Bruce Bodine (Mosaic), Chris Bohn (CF Industries), Kenneth Seitz (Nutrien), and Sabine Schroder (Yara).[85] As a trade association located in Arlington, Virginia, near Washington, D.C., The Fertilizer Institute claims to "advance the economic and reputational health of the fertilizer industry by advocating for the economic, environmental, and social benefits of fertilizer," among

---

82 *2021 Annual Report*, *supra*.

83 *IFASTAT*, International Fertilizer Association, https://www.fertilizer.org/market-intelligence/ifastat/ (accessed March 22, 2026).

84 *Id.*

85 *Leadership*, The Fertilizer Institute, https://www.tfi.org/about-us/leadership/ (accessed March 11, 2026).

other interests.[86] The Fertilizer Institute sponsors trade events such as the Ford West Leadership Academy, set for 2027 in Tampa Florida, as well as an Agronomy Conference & Expo.[87]

111. The Fertilizer Institute operates a web page about its "Market Intelligence Insights."[88] That page notes The Fertilizer Institute's statistics include:

> a) The Fertilizer RECORD (monthly data released quarterly): The RECORD provides the most current monthly information on production, producer inventories and producer disappearance.
>
> b) Fertilizer Imports and Exports: Monthly fertilizer trade data (quantity and value) by material and country of origin for imports and by country of destination for exports. The report also includes totals by nutrient.
>
> c) Phosphate Materials Export Report: Reports U.S. exports of combined diammonium phosphate (DAP) and monoammonium phosphate (MAP) by country of destination on a monthly, calendar year-to-date and fertilizer year-to-date basis.
>
> d) Feedgrade Phosphate Report: Reports monthly sales of dicalcium, tricalcium and monocalcium phosphate. This report also includes a monthly history back to January 1984.[89]

**7. History of Collusion**

112. Previous participation in cartels enables participants to recognize opportunities to profitably engage in anticompetitive conduct while more effectively evading detection. Previous collusion is also consistent with other industry conditions encouraging and facilitating collusion.

---

[86] *About Us*, The Fertilizer Institute, https://www.tfi.org/about-us/ (accessed March 11, 2026).

[87] *Event Calendar*, The Fertilizer Institute, https://www.tfi.org/events/event-calendar/ (accessed March 11, 2026).

[88] *Market Intelligence Insights,* The Fertilizer Institute, https://www.tfi.org/insights/market-intelligence-insights/ (accessed March 22, 2026).

[89] *Market Intelligence Insights,* The Fertilizer Institute, https://www.tfi.org/insights/market-intelligence-insights/ (accessed March 22, 2026).

Accordingly, allegations of antitrust recidivism, as here, along with other facts, support an inference of conspiracy.

113. The fertilizer industry includes such a history of antitrust violations. In *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d at 849, civil plaintiffs alleged those defendants including Mosaic (and Agrium and Potash Corporation of Saskatchewan) restrained global potash output in order to inflate prices. Considering that complaint, the Seventh Circuit Court of Appeals, sitting *en banc*, said, "We are also satisfied that the allegations suffice, at this stage, to support a plausible story of concerted action." *Id.* at 860. The Defendants eventually paid multimillion dollar settlements to both direct and indirect purchaser plaintiffs in that case.

## III. CONTINUING VIOLATION

114. During the Class Period, Defendants continued to sell NPK Fertilizers to Plaintiff and other Class members at prices artificially inflated by Defendants' conspiracy to fix prices.

115. Due to fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple, coordinated price supports and price increases throughout the Class Period, as described above.

116. Each of these activities resulted in new overt acts that injured Plaintiff and members of the Class, thus creating a new cause of action for purposes of the statute of limitations.

117. In addition, each sale of NPK Fertilizer made to Plaintiff and members of the Class during the Class Period that were artificially inflated as a result of the conspiracy also constituted a new overt act that restarted the statute of limitations.

118. These new overt acts, which would not have occurred had the conspiracy disbanded, were not merely reaffirmations of Defendants' previous actions. Rather, they constituted new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiff and other members of the Class.

119. As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period. Accordingly, the claims of Plaintiff and the other Class members are not time-barred.

## IV. CONCEALMENT OF ANTITRUST VIOLATION.

120. Plaintiff and the members of the Class had neither actual nor constructive knowledge of the facts constituting their claim for relief. Plaintiff and members of the Class did not discover and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until shortly before filing this Complaint. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for NPK Fertilizers. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and Class members.

121. The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, on information and belief including, but not limited to, secret meetings and surreptitious communications between Defendants.

122. Not until Deputy Secretary Vadan's comments in late January 2026 did the federal government discuss the possibility of collusion in this industry. Further, news of the Department of Justice's investigation was not disclosed until March 2026.

123. Defendants conducted their anticompetitive conspiracy in a manner to hide it, making it, by its design, self-concealing. NPK Fertilizers are not exempt from antitrust regulation, and thus before these recent events Plaintiff reasonably considered it to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' NPK Fertilizer prices before these recent events.

124. Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and other Class

Members. For example, Mosaic's annual report for 2023 stated, "Our Phosphates segment operates in a highly competitive global market."[90] Soon after that, it stated, "Potash is a commodity available from several geographical regions around the world, and, consequently, the market is highly competitive."[91]

125. Nutrien's Annual Information Form for 2022 stated, "We price competitively, sell high-quality products and provide high-quality service to our customers."[92] It also stated, "Markets for phosphate fertilizer products are highly competitive and based largely on price, reliability and deliverability."[93] It also stated, "The market for Nutrien's Retail products and services is highly competitive in the countries in which we operate."[94]

126. In CF Industries' annual report for 2022, it stated, "Our markets are global and intensely competitive, based primarily on delivered price and, to a lesser extent, on customer service and product quality."[95] Later, it stated, "We operate in a highly competitive, global industry."[96]

127. By virtue of the fraudulent concealment of their wrongful conduct by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class members have as a result of this unlawful combination and conspiracy alleged in this Complaint.

---

[90] The Mosaic Company, Annual Report (Form 10-K) at 16 (Dec. 31, 2023), Seeking Alpha, https://seekingalpha.com/filings/pdf/17296769 (accessed March 25, 2026).

[91] *Id.*

[92] Nutrien Ltd. Annual Information Form at 16 (Year ended December 31, 2022).

[93] *Id.*

[94] *Id.* at 10.

[95] CF Industries, Annual Report (Form 10-K) at 7.

[96] *Id.* at 29.

## V. INTERSTATE TRADE AND COMMERCE

128. Beginning at least around January 1, 2021, and continuing until the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, Defendants sold substantial quantities of NPK Fertilizers in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where the Defendants produced their NPK Fertilizers.

129. Defendants' conspiracy had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories. For example, in 2023, the United States consumed 20.13 million metric tons of fertilizer nutrients.[97] Defendants own facilities in the United States and made and sold products in the United States, affecting United States commerce.

130. Further, Defendants knew that their NPK Fertilizers would enter the United States stream of commerce and would affect United States commerce, including harm to Plaintiff and the proposed Class in the payment of supra-competitive prices for NPK Fertilizers.

131. To the extent any Defendant sold NPK Fertilizers from other countries into the United States, those sales constitute import commerce into the United States and Defendants' price-fixing had a substantial intended effect on United States import commerce by increasing the prices that direct purchasers, including Plaintiff and the proposed Class paid for NPK Fertilizer.

132. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for NPK Fertilizers in the United States.

[97] Sasu, *Global Consumption of Fertilizers 2023, by Country, supra*.

133. Defendants' unlawful conduct described herein caused inflated prices for NPK Fertilizer in the United States, and within those States.

134. Defendants' unlawful conduct has had a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of NPK Fertilizers sold in the United States, the price of NPK Fertilizers would have been determined by a competitive market.

## VI. ANTITRUST INJURY

135. Defendants' antitrust conspiracy had the following effects, among others:

a) price competition has been restrained or eliminated with respect to the pricing of NPK Fertilizers;

b) the prices of NPK Fertilizers have been fixed, raised, maintained or stabilized at artificially inflated levels;

c) purchasers of NPK Fertilizers have been deprived of the benefits of free and open competition; and

d) Plaintiff and other Class members have paid higher and artificially inflated prices for NPK Fertilizers as a direct, foreseeable, and proximate result of Defendants' conduct.

136. The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of NPK Fertilizer.

137. Defendants' contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

138. The precise amount of the overcharge affecting the price of NPK Fertilizer paid by Plaintiff and the Class can be measured and quantified using well-accepted models. As a result, the economic harm to Plaintiff and other Class members can readily be quantified.

139. By reason of the alleged violations of the antitrust laws, Plaintiff and the other members of the Class have sustained injury to their business or property, having paid higher prices for NPK Fertilizer than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VII. CLASS ACTION ALLEGATIONS

140. Plaintiff brings this action for damages and injunctive relief on behalf of himself and a Class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include (the "Class"):

> All persons or entities that purchased any NPK Fertilizer directly from one or more Defendants within the United States from January 1, 2021 until the present (the "Class Period").

141. The class definition specifically excludes the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

142. Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

143. Numerosity, Fed. R. Civ. P. 23(a)(1): Plaintiff does not know the exact number of Class members because such information presently is in the Defendants' control. However, as previously noted the United States had 1,900,487 farms, and other businesses such as distributors,

retailers, golf courses, garden stores, and landscapers also purchase NPK Fertilizer. Based on that and the nature of the trade and commerce involved, Plaintiff reasonably believes that there are at least thousands of members in the Class. Therefore, the Class is so numerous and geographically dispersed across the United States that joinder of all members is impracticable.

144. Common Questions Predominate, Fed. R. Civ. P. 23(a)(2) and (b)(3): Numerous questions of law and fact are common to the Class related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

a. whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for NPK Fertilizer during the Class Period;

b. whether such agreements constituted violations of the Sherman Antitrust Act;

c. the identity of the participants of the alleged conspiracy;

d. the duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e. whether Defendants fraudulently concealed their misconduct;

f. whether and to what extent Defendants' anticompetitive scheme inflated prices of NPK Fertilizer above competitive levels;

g. the nature and scope of injunctive relief necessary to restore competition; and

h. the measure of damages suffered by Plaintiff and the Damages Class.

These and other questions of law or fact that are common to the members of the Class predominate over any questions affecting only individual members of the Class. Plaintiff can prove the elements of their claim on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

145. Typicality, Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of other members of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

146. Plaintiff and the other Class members were injured by the same unlawful conduct, which resulted in their paying more for NPK Fertilizer than they would have in a competitive market.

147. Adequacy of Representation, Fed. R. Civ. P. 23(a)(4): Plaintiff will fairly and adequately represent the interests of the Class because Plaintiff purchased NPK Fertilizer directly from Defendants within the United States during the Class Period. Plaintiff has no material conflicts with any other members of the Class that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is adverse to the interests of other members of the Class, and the infringement of rights and damages Plaintiff sustained are typical of those of other members of the Class. Furthermore, Plaintiff has retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiff intends to prosecute this action vigorously.

148. Common Grounds for Injunctive Relief, Fed. R. Civ. P. 23(b)(2): Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

149. Superiority, Fed. R. Civ. P. 23(b)(3): Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh the efforts required to manage this class action.

150. This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## VIII. CLAIMS FOR RELIEF

### COUNT ONE
### Violation of the Sherman Act, 15 U.S.C. § 1, 3
### Conspiracy Restraining Trade
### (Against All Defendants)

151. Plaintiff hereby repeats and incorporates by reference each preceding paragraph as though fully set forth herein.

152. From at least January 1, 2021, until the present, Defendants entered into and engaged in a contract, combination, conspiracy, or agreement to unreasonably restrain trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) by artificially restraining competition with respect to the price of NPK Fertilizers sold in the United States.

153. The contract, combination, or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for NPK Fertilizer in the United States.

154. In formulating and effectuating this conspiracy, Defendants and their co-conspirators engaged in those actions that they combined and conspired to do, including but not limited to:

a) exchanging competitively sensitive information among themselves with the aim to fix, increase, maintain, or stabilize prices of NPK Fertilizer sold in the United States;

b) participating in meetings, conversations, and other communications among themselves during which they agreed to charge prices at certain levels, manipulate the price and supply of NPK Fertilizer, and otherwise to fix, increase, maintain, or stabilize prices of NPK Fertilizer sold in the United States;

c) communicating in writing and orally to fix prices and manipulate the supply of NPK Fertilizer;

d) participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached;

e) selling NPK Fertilizer to customers in the United States at supra-competitive prices; and

f) engaging in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize the price of NPK Fertilizer.

155. The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and maintain the price of NPK Fertilizer.

156. Defendants' activities constitute a *per se* violation of Sections 1 and 3 of the Sherman Act.

157. Defendants' conspiracy had the following effects, among others:

a) price competition in the market for NPK Fertilizer has been restrained, suppressed, and/or eliminated;

b) prices for NPK Fertilizer provided by the Defendants have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere;

c) Plaintiff and members of the Class who purchased NPK Fertilizer from Defendants have been deprived of the benefits of free and open competition; and,

d) purchasers of NPK Fertilizer paid artificially inflated prices.

158. Defendants' price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for NPK Fertilizer produced in or imported into the United States.

159. During the Class Period, Plaintiff and other members of the Class purchased NPK Fertilizer directly from Defendants or their subsidiaries, agents, and/or affiliates, and by reason of the antitrust violations alleged herein, paid more for NPK Fertilizer than they would have paid in the absence of such antitrust violations.

160. Plaintiff and other members of the Class have been injured and will continue to be injured in their business and property by paying more for NPK Fertilizer than they would have paid in the absence of the conspiracy. As a direct and proximate result, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to prevent and punish.

161. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

162. For this conduct, Plaintiff and other members of the Class are entitled to treble damages, injunctive relief, and attorneys' fees and costs pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that the Court enter judgment on its behalf and on behalf of the Class, by adjudging and decreeing as follows:

A. Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

B. Appointing Plaintiff as a representative of the Class and the undersigned law firms as Class Counsel, and directing that Plaintiff and Class Counsel provide reasonable notice to Class members of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure;

C. Adjudging and decreeing that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators are a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

D. Awarding damages for Defendants' violations of the Sherman Act (15 U.S.C. §§ 1, 3);

E. Entering judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees and pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

F. Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a

similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect; and

G. Awarding Plaintiff and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all claims asserted in this Complaint that are so triable.

Dated: April 3, 2026

Respectfully submitted,

LOCKRIDGE GRINDAL NAUEN PLLP

***s/Heidi M. Silton***

Heidi M. Silton (MN #025759X)
Jessica N. Servais (MN #0326744)
Joseph C. Bourne (MN #0389922)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
hmsilton@locklaw.com
jnservais@locklaw.com
jcbourne@locklaw.com

Kyle J. Pozan (IL #6306761)
LOCKRIDGE GRINDAL NAUEN PLLP
1165 N. Clark Street, Suite 700
Chicago, IL 60610
(312) 470-4333
kjpozan@locklaw.com

H. Samuel Prim, III (*pro hac vice* forthcoming)
PRIM & MENDHEIM, LLC
P.O. Box 2147 (36302)
103 Jamestown Boulevard
Dothan, AL 36301
(334) 671-9555
samuelprim@gmail.com

***Counsel for Plaintiff***